**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>JAMES TONEY,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Plaintiff,</td><td>*</td><td></td></tr>
<tr><td>v.</td><td>*</td><td>Civil Case No. SAG-19-0405</td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>POWERCON CORPORATION,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Defendant.</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
</table>

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

Plaintiff James Toney ("Toney") filed a three-count Complaint against his former employer, Powercon Corporation ("Powercon"), alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). ECF 1. Discovery is now concluded, and Powercon has filed a Motion for Summary Judgment, ECF 38, accompanied by a Memorandum of Law in Support thereof, ECF 38-1 (collectively, "the Motion"). I have reviewed the Motion, along with Toney's Opposition and Memorandum in Support, ECF 42 and 42-1, and Powercon's Reply, ECF 45. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons that follow, I will grant Powercon's Motion.

## I.     FACTUAL BACKGROUND

The facts are viewed in the light most favorable to Toney, the non-moving party. As alleged in the Complaint and undisputed by Powercon, Powercon is a manufacturing company in Severn, Maryland. ECF 1 ¶ 6. At all times relevant to this Complaint, Powercon employed two Full-Time Commercial Drivers License ("CDL") Drivers, who transported materials in tractor trailers between Severn, Maryland and Cumberland, Maryland: Marvin Hayes and David Darr. ECF 38-2 at 128:5-129:4; ECF 38-3 ¶ 3. Hayes, an African American employee, worked at

Powercon for more than ten years before Toney was hired. ECF 38-2 at 129:2-4; ECF 38-9 Exh. 1 (application for employment). Darr, a Caucasian employee, worked at Powercon for more than one year before Toney was hired. ECF 38-2 at 128:20-129:1; ECF 38-9 Exh. 2 (application for employment).

In 2016, two supervisory employees in Powercon's Severn warehouse, Paul Slattery and Dennis Mooney, agreed that Powercon should hire a Back-Up CDL Driver, for times when Hayes or Darr might be unavailable. ECF 38-3 ¶ 4. When not needed to fill in driving the tractor trailers, the Back-Up CDL Driver would perform general duties as a Material Handler at the Severn warehouse, including operation of a forklift, pallet jack, and hand jack to move materials within the warehouse and between locations on the premises. *Id.*

Mooney saw Toney's resume on ZipRecruiter and contacted him to ascertain his interest. ECF 38-7 at 27:13-19. Toney subsequently filled out a formal Employment Application for Powercon, in which he claimed experience operating forklifts, pallet jacks, cherry pickers, straight trucks, and tractor trailers. ECF 42-3. After reviewing Toney's application, Mooney interviewed Toney in person. ECF 38-7 at 27:18-28:6. At the interview, according to Toney, Mooney explained that the job entailed driving tractor trailers to Hagerstown or to the other warehouse, and driving the van to pick up mail. *Id.* at 28:8-29:2. Toney seemed very receptive and polite during the interview, and after the interview, Mooney told Slattery that he would like to hire Toney. ECF 42-4 at 19:16-21:11. Slattery obtained Siegel's approval to offer Toney employment at a rate of $19 per hour. *Id.* at 24:1-7.

Toney accepted the offer of employment, and started work in early October, 2016. ECF 38-3 ¶ 5. Powercon's payroll records note that Toney was hired as a "Back Up CDL Driver" in the "Material Handling" Department. ECF 38-9 Exh. 9. Mooney served as Toney's direct supervisor,

with Slattery serving as his second level supervisor. ECF 38-3 ¶ 5; ECF 38-2 at 27:18-28:1, 54:2-3 (stating that Slattery was Mooney's supervisor).

When Toney first started on the job, the two Full-Time CDL drivers trained him on the tractor trailer routes. ECF 38-4 at 26:1-21. The training period lasted approximately six weeks. *Id.* After the training, Toney alleges that "Mooney changed my job description from truck driving to warehouse" and began asking him to load trucks and material in the warehouse. ECF 38-7 at 40:17-41:19. Mooney told Toney that he had been hired as a material handler, which "caught [Toney] offguard" because he viewed himself as a tractor trailer driver. ECF 38-7 at 43:4-18. However, Toney testified that he "didn't mind doing" the material handler duties and had "the skills to do it." *Id.* at 45:2-19.

In early 2017, Toney complained to Mooney that he had not received pay for some lunch breaks that he had worked during his initial training period. Exh. 38-3 ¶ 8. As a result of the complaints, on January 13, 2017, Powercon's Chief Financial Officer, Roger Wolfe, met with Toney to discuss the lunch break allegations, and to ask if Toney had any other issues. ECF 38-9 ¶¶ 3-4 ("I met with Mr. Toney, and asked him whether he had any other concerns regarding his employment."). On January 13, 2017, Toney sent a six-page letter to Wolfe and Siegel. ECF 1-2. In the letter, *inter alia,* Toney claimed:

1) Nine instances in which he did not receive pay for working through his lunch break, although the other drivers had received compensation for theirs, ECF 1-2 at 4;

2) Occasions in which he had traveled with another driver to Cumberland, but received pay for fewer hours than the other driver, ECF 1-2 at 1;

3) Receiving pay for only one job, despite performing tasks involving both driving and materials handling, *id.*; and

4) An instance in which a manager named "Myron" entered the bathroom at Powercon while Toney was in a stall, banged on the stall door, and conversed with Toney while peering through the cracks in the stall door, ECF 1-2 at 3-4.[1]

Toney's letter also generally alleged that he had been "harassed, intimidated[,] lied on, sexually harassed, threatened and treated unfairly, not paid the same on or off of lunch breaks like the other drivers, discriminated, yelled at and treated like a slave." ECF 1-2 at 1. He suggested that he received unfair discipline in situations in which other employees would not have been written up. *Id.* at 2-6.

On January 20, 2017, Wolfe wrote back to Toney to address his concerns. ECF 1-3. Wolfe assured Toney, "Your comments are being taken very seriously by upper management, and are under review." *Id.* at 1. Wolfe informed Toney that his next check would include pay for the nine lunch hours he had claimed, although Powercon was paying the claims "without review as a gesture of good will." *Id.* The letter specified that any future authorization to work through lunch would have to be cleared with Mooney. *Id.* Finally, the letter instructed Toney to punch in at 6 a.m., and not to punch out before 2:30 p.m., in order to ensure his full pay for 8-hour shifts. *Id.* The letter clarified that Toney had been hired for a single position, which incorporated some materials handling and some driving duties, not for two separate jobs. *Id.* at 2.

On January 23, 2017, Toney reported to the Anne Arundel County Police Department that his car tire had been punctured in the Powercon parking lot. ECF 1-4. Toney advised the officer that he "has been having problems with management and some of his co-workers." *Id.* at 2. The reporting officer viewed the security footage, but did not see anyone tampering with Toney's vehicle. *Id.*

---

[1] At deposition, Toney testified that he did not know whether Myron was disciplined for the incident. ECF 42-5 at 65:13-18.

On January 25, 2017, at Mooney's request, Toney loaded materials onto a trailer at the warehouse, using an electric pallet jack. ECF 38-3 Exh. 1 at 11 (policy violation disciplinary form). A manager in another department, Tom Jones, heard a loud banging sound each time Toney entered the trailer. *Id.* at 12. Jones instructed Toney to raise the arms of the pallet-jack, to avoid striking the trailer floor. *Id.* Toney responded by asking Jones whether he would like to load the trailer himself, and tried to hand Jones the controls for the pallet jack. *Id.* Jones later reported that Toney's actions had destroyed the trailer's plywood floor sheet. *Id.*

Later in the day on January 25, 2017, Mooney asked Plaintiff to load another trailer. *Id.* at 13. This trailer had a steel plate on its floor, with a slightly raised corner. *Id.* Mooney advised Toney to avoid striking the plate with the pallet jack when entering the trailer, due to the corner. *Id.* However, Toney struck the plate with the pallet jack several times, which caused the corner of the plate to stick up at almost a ninety-degree angle. *Id.* Toney then exited the trailer with the pallet jack, and advised Mooney that Mooney needed to fix the plate. *Id.* (recounting that he told Mooney that "he need[ed] to fix that"). Mooney and another employee had to bend the plate back with a sledgehammer and forklift to repair Toney's work. *Id.*

Two days later, on January 27, 2017, Mooney instructed Toney to move "skids" from one building to another. ECF 38-3 Exh. 1 at 15. During the meeting, another employee called Mooney to inform him that Toney was only moving the material partway to its intended destination. *Id.* (stating Toney would not take the skids to the new building because "it [was] too far of a walk"). Mooney asked Wolfe to accompany him to meet with Toney. *Id.* Mooney asked Toney why he had not complied with his directions, and Toney claimed that the skids of material could not fit on the pallet jack, so another employee had to use the forklift to move the materials. *Id.* Mooney told Toney that the skids did fit on the pallet jack, and instructed him to move them after his lunch

break. *Id.* However, Toney refused, and told Mooney to have the employee using the forklift do it. *Id.* ("[H]e told me no and to have Ed do it.").

Mooney decided to assign Toney to a different material handling task, and recommended that Toney use a forklift to move crates to the dock. *Id.* at 14. However, Toney insisted on using a pallet jack, and attempted the task for about five minutes before determining that the job could not be done. *Id.* Because Toney claimed not to know where the forklifts were, Mooney retrieved a forklift, and began moving the crates to show Toney how to do the task. *Id.* However, during Mooney's demonstration, Toney walked away. *See id.* ("I went to look for him so he could finish moving the rest but I couldn't find him.") Subsequently, Mooney learned that Toney had left to finish the task he had not completed earlier in the day, namely moving the skids. *Id.*

Slattery met with Toney on January 31, 2017, to issue disciplinary forms for the incidents of insubordination on January 25, 2017 and January 27, 2017. *Id.* at 16. Slattery issued Toney a written warning for the incidents on the 25th, and a three-day suspension for his actions on the 27th. *Id.* Toney refused to sign the disciplinary forms. *Id.* Slattery also told Toney that "further insubordination or failure to follow directives would be grounds for termination." ECF 38-5 ¶ 8. Toney's suspension lasted from February 1, 2017 through February 3, 2017. *Id.* ¶ 9.

On February 1, 2017, Toney filed an EEOC charge. ECF 1-5. Specifically, he alleged:

> Since the beginning of my employment, Mr. Dennis Moonie [sic], supervisor has treated me differently to the other white drivers. I was paid less and I was not paid for working through lunch unlike my white co-worker Mr. Dave (LNU). In December 2016, I addressed my concern to Mr. Moonie, and he reduced my work hours. Mr. Moonie also moves me from my driving duties to work in area that are not part of my driving responsibility. On December 29, 2016, I was harassed by Mr. Myron (LNU) checking up on me, while I was using the bathroom; I insisted he leaves the bathroom, but refused and commented while I was taking long time. On January 13, 2017, I wrote Ms. Janet Siegel, Owner, addressing my concerns of disparate treatment. On January 20, 2017, Mr. Roger Wolfe, Respondent's Chief Financial Officer, addressed my concerns, replied to me that Mr. Moonie treated me differently because I was a new employee and nothing else was done. On

January 25, 2017, I was retaliated against when my privately owned vehicle tire was slashed at Respondent [sic] parking lot. I reported this to Mr. Wolfe and nothing was done.

ECF 1-5 at 1. Powercon received notice of the first EEOC charge shortly after its filing, and prior to Toney's termination. ECF 42-11 at 37:4-17; ECF 38-5 ¶ 10.

On Toney's first day back to work after suspension, he arrived ten minutes late. ECF 38-9 at 22. The next day, February 7, 2017, Toney texted Mooney to advise that he would miss work for a medical appointment. ECF 38-3 ¶ 9. On February 8, 2017, Toney again arrived ten minutes late for work. ECF 38-9 at 22. After lunch on that date, Mooney directed Toney to move materials from a storage unit to another location on the premises. ECF 38-3 Exh. 1 at 6. Toney stated that he wanted to use a forklift for the task, but no forklift was available. *Id.* Mooney directed Toney to use an electric pallet jack, because it had a strap that would keep the materials from falling over. *Id.* Toney insisted that he would not do the job by himself. *Id.* Mooney told Toney that no employees were available to assist, and that another material handler had performed the task on several prior occasions without assistance. *Id.* When Toney still declined to perform the task, Mooney brought Toney to Slattery, and told Slattery what had happened. *Id.* After hearing from Mooney and Toney, Slattery sent Toney home, and advised that someone would be in touch. *Id.*

Siegel decided to terminate Toney's employment, due to his continued refusal to follow instructions from his supervisor, Mooney. *See* ECF 38-6 at 7:20-25. Siegel directed Wolfe to call Toney on February 8, 2017, to advise him that he was being terminated for continued insubordination after his suspension. ECF 38-2 at 60:16-61:17. On February 9, 2017, Toney filed a second charge of discrimination with the EEOC, alleging that he was terminated in retaliation for his first charge. ECF 1-6.

Eventually, as to Toney's first EEOC charge, the EEOC "determined that the evidence obtained during the investigation establishes that there is reasonable cause to believe [Powercon] imperiled [Toney] to harassment, intimidation, denied him utilization of Respondent facility. As to the other allegations the Commission makes no finding." ECF 42-7 at 1-2. The EEOC offered informal conciliation, and if the conciliation did not take place or was unsuccessful, "will inform the parties and advise them of the court enforcement alternatives available to aggrieved persons and the Commission." *Id.* at 2. As to Toney's second EEOC charge, the EEOC stated, "[t]he record shows a causal connection between Respondent action of retaliation against [Toney] and his discharge upon Respondent's receipt of EEOC notification of discrimination charge filed against Respondent on February 1, 2017." ECF 42-8 at 1-2. Once again, the EEOC offered conciliation and advice about "court enforcement alternatives." *Id.* at 2. Also, the Board of Appeals of the Maryland Department of Labor, Licensing and Regulation upheld an administrative finding that Toney had not been "discharged for misconduct or gross misconduct connected with the work," after Powercon appealed the determination. ECF 42-9. The evidentiary hearing, upon which the finding was premised, had been attended only by a Powercon witness without "first-hand knowledge of the events," who was unable to rebut Toney's sworn testimony. *Id.* at 5.

In his deposition in connection with this lawsuit, Toney testified that he was disrespected, cursed at, and that racial slurs were used against him. ECF 38-7 at 53:10-54:13. When he spoke with Mooney about one of the incidents of cussing and yelling, Mooney essentially replied, "this is the way we operate around here." *Id.* at 56:4-5. On one occasion, Toney heard a group of employees in a huddle state, "[w]ho that nigger think he is this [sic]?" in reference to him. *Id.* at 53:21-54:4; 57:7-58:5.

Toney also testified that, on one occasion, a note was left in a truck that everybody drove, but he drove most frequently. ECF 38-7 at 60:14-61:4. The note stated, "ATTN: All Assholes Turn off the fucken [sic] key switch or stayout [sic] of the fucken [sic] truck!!! Any problems see Zig." ECF 42-6. Toney further testified that his co-worker, "Ziggy," cursed at him one day for asking why he was parking the van in the van spot. ECF 38-7 at 54:11-13. Another unnamed driver in the warehouse shop "cussed [Toney] out real bad, and wanted to get in a verbal altercation, a physical altercation." *Id.* at 54:14-17. But Toney could not recall the driver's name. *Id.* One of the supervisors on the dock cursed and yelled at Toney, but Mooney said, "Don't worry about it. That's how they act. I thought you was going to hit him. He acts like that to everybody." *Id.* at 55:11-16. Also, a supervisor down in Midway (who may be "Myron") "cussed and disrespected" Toney and yelled at him. *Id.* at 64:6-13. Toney reported it to Mooney, who said, "He's an old man. He does that. Don't worry about it. I cuss him out sometimes" and suggested "this is the way we operate around here." *Id.* at 55:17-56:6, 64:6-13. A forklift operator also "cussed at" Toney after almost hitting him with a truck. *Id.* at 56:9-11. Mooney "cussed at" Toney a few times in reference to taking product from one building to another. *See id.* at 67:9-11 ("[Mooney] said, "No, I said take it and put it over there. Did you hear what the hell I said?"). And another forklift operator "cussed at" Toney for bringing material to the end of a building when he wanted it to be brought to another building with a hand pallet. *Id.* at 68:21-69:12.

## II.    LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that there is no genuine dispute of material facts. *See Casey v. Geek Squad*, 823 F. Supp.

2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

### III.   ANALYSIS

Toney alleges three separate violations of Title VII.  First, Toney alleges that Powercon subjected him to race discrimination.  ECF 1 ¶¶ 33-37.  Second, Toney alleges that Powercon created a hostile work environment based on his race.  *Id.* ¶¶ 38-49. Third, Toney alleges that Powercon retaliated against him for his complaints to the EEOC by taking adverse employment actions, including his termination.  *Id.* ¶¶ 50-58. Each claim is addressed in turn.

### A.  Disparate Impact/ Disparate Treatment

Count One of Plaintiff's Complaint is captioned, "Race Discrimination (Disparate Impact)."  ECF 1 at 5.  Title VII prohibits "a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin."  42 USC 2000e-2(k)(1)(A)(i). A plaintiff endeavoring to set forth a prima facie case of disparate impact must "show that the facially neutral employment practice had a significantly discriminatory impact."  *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 265 (4th Cir. 2005) (citations omitted). Plaintiff's Complaint cites no such employment practice, and Plaintiff has not adduced the statistical analysis or expert testimony typically required to support a disparate impact claim.  *See EEOC v. Freeman,* 961 F.Supp. 2d 783, 786 (D. Md. 2013) (noting that proof of a disparate impact "requires reliable and accurate statistical analysis performed by a qualified expert.")

Instead, it appears that Toney may have intended to assert a claim for disparate treatment. Absent any direct evidence of Powercon's intent to treat its employees differently based on race, Toney must use the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  Under that framework, he must first establish a prima facie case, including evidence (1) that he is a member of a protected class, (2) that he was meeting Powercon's legitimate job expectations, (3) that he suffered an adverse employment action, and (4) that

similarly situated employees outside of the protected class were treated differently. *See White v. BFI Waste Servs., LLC,* 375 F.3d 288, 295 (4th Cir. 2004).

Although Toney is undoubtedly a member of a protected class, he has failed to establish the other components of a prima facie case. Toney's Complaint does not specifically allege any particular adverse employment action in connection with his discrimination claim. It states that Powercon "allowed Plaintiffs' [sic] Supervisor to intentionally discriminate against the Plaintiff by treating him differently and less favorably than other similarly situated Caucasian employees without any disciplinary actions being taken against the Supervisor which lead [sic] to a disproportionate impact on the Plaintiff based on his race, African American." ECF 1 ¶ 34.

First, Toney has not shown that he was meeting his employer's legitimate job expectations. Importantly, it is the "perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000). Powercon provided evidence that Toney refused to follow the instructions of his supervisors on multiple occasions. *See, e.g.*, ECF 38-3 ("Policy Violation and Disciplinary Form[s]"). Although Toney contends that he did not fail to heed Powercon's instructions on January 25, he did not attempt to rebut the testimony of Mooney or Slattery regarding his insubordination on January 27 and February 8. *See* ECF 42-1 at 5. Moreover, Toney does not dispute that he was late for work on the days immediately following his suspension. Thus, "even when viewing the evidence in the light most favorable to" Toney, "no jury would find that he was meeting [Powercon's] legitimate performance expectations." *Warch v. Ohio Cas. Ins. Co,*, 435 F.3d 510, 518 (4th Cir. 2006).

Second, Toney has not shown that similarly situated employees, outside of his protected class, were treated differently. In his opposition, Toney cites just two comparators, Darr and Hayes. ECF 42-1 at 6-7. As an initial matter, one of those two individuals is also African American, *see*

ECF 38-2 at 129:2-4, and thus the fact that he received different treatment actually undermines Toney's contention that he was discriminated against on the basis of his race. *See Crawford v. Newport News Indus. Corp.*, 2018 WL 4561671, at *82 (E.D. Va. Mar. 2, 2018) (finding that co-plaintiffs are also African American, and thus, are not outside of the protected class). In addition, Darr and Hayes did not hold the same Backup CDL Driver/Material Handler position as Toney. The uncontroverted evidence is that the Full-Time CDL Drivers transport materials between Severn and Cumberland/Hagerstown on a regular basis. Thus, they would not have had the same regular interaction with Mooney and the other warehouse employees as Toney had, and would not have received the same work assignments leading to the alleged insubordination. *See* ECF 38-7 at 30:12-18 (Toney's testimony that, "[A]ll [Hayes] did was take runs to Hagerstown. That's all that I know him to do. . . He wasn't never there really."); *id.* at 31:2-7 (Toney's testimony that Darr's job duties were "[s]upposed to be the same as mine," but Toney only ever saw Darr driving). Indeed, Toney concedes that he "had different daily tasks" than Darr and Hayes, since they were full-time CDL drivers. ECF 42-1 at 6. Nonetheless, Toney contends that his hybrid job shared a "common core" with the tasks of a Full-Time CDL driver. *Id.* However, his own allegations regarding the tasks he was asked to perform, in contrast to those the Full-Time CDL drivers performed, suggest that they did not. *See, e.g.,* ECF 38-7 at 61:7-9 ("Dave [Darr] has a truck he rides all the time. Marvin [Hayes] has a truck he rides all the time. When I'm working at the warehouse, there's no other driver that's working that but me."). In the case Toney cites for support, *Hassman v. Valley Motors, Inc.*, 790 F.Supp. 564 (D. Md. 1992), the plaintiff contended that she and her male co-workers held the same title of "business manager." *Id.* at 568. The Court, however, found that the job title was not dispositive, since the plaintiff's co-workers "performed duties requiring greater skill and responsibility." *Id.* Here, Tony and his proffered comparators did

not even have the same job title. Moreover, Toney's unsubstantiated assertion that their jobs had a "common core" of tasks is not persuasive, particularly given his testimony that he had the skills to perform, and did not mind performing, the warehouse tasks.

As established above, Toney has failed to identify similarly situated comparators. But even assuming *arguendo* that Darr and Hayes provide a valid point of comparison, Toney has not shown that they were treated differently. Toney vaguely claims that he was "exposed to relentless uncomfortable working conditions that Mr. Darr, Mr. Hayes, and other employees were not." ECF 42-1 at 6. But instead of offering evidence to support his claims, Toney merely shifts the burden to Powercon. *See* ECF 42-1 at 6 ("Defense offered no documented evidence suggesting other employees in Mr. Toney's position also have complained regarding the verbal abuse and cussing"). Although Toney attempts to shift the burden to Powercon, he, as the plaintiff, has the burden to set forth his prima facie case of disparate treatment. *See Hurst v. District of Columbia*, 681 F. App'x 186, 190 (4th Cir. 2017) ("Only if the plaintiff succeeds in proving a prima facie case will the burden shift to the employer"). Powercon has no burden to identify other people who experienced similar treatment to that alleged by Toney.

Finally, Toney alleges that he "found himself not being able to park where his white counterparts were permitted to park." ECF 42-1 at 3. He cites no evidence to explain or support that contention, except for the EEOC Determination letter relating to his first charge. *Id.* That letter does not cite any competent evidence of discriminatory parking policies. It conclusorily alleges, "Documentary evidence further reveals that Respondent restricted Charging Party's utilization of Respondent's parking lot facility while his white counterparts were allowed to use the parking lot." ECF 42-7 at 1. However, it does not identify or cite the "documentary evidence" it references, to permit this Court to consider it for purposes of finding a genuine issue of material

fact. The evidence before the Court does not suggest who told Toney he could not park in the parking lot, and does not establish that any white employees were permitted to park in any particular location.[2] Accordingly, Toney has not set forth a prima facie case of discriminatory treatment on the basis of his race, and summary judgment will be granted as to Count One.

### B. Hostile Work Environment

In Count Two, Toney alleges that Powercon violated Title VII by subjecting him to a hostile work environment, which exists where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted). To establish a Title VII claim for a hostile work environment, "a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiff's … race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 271 (4th Cir. 2015) (quoting *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011) (alteration and internal quotation marks omitted)). "If the harasser is a supervisor, then the employer may be either strictly or vicariously liable," depending on whether the harassment culminates in a tangible employment action. *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 332–33 (4th Cir. 2018). In contrast, harassment by a co-worker or a third-party, resulting in a hostile work environment, can be imputed to an employer only "if the employer knew or should have known of the harassment and

---

[2] At his deposition, Toney testified about a meeting at which Mooney told employees "no one can park their vehicles up there," but that after the meeting, Toney "took pictures of people who were still parking there." ECF 38-7 at 71. It is unclear whether this is the "parking lot" in question, whether Powercon countenanced the continued parking, or whether the employees who disregarded Mooney's generalized parking instruction are all of a particular race.

failed 'to take prompt remedial action reasonably calculated to end the harassment.'" *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 422-23 (4th Cir. 2014) (quoting *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1131 (4th Cir.1995)) (internal quotations omitted).

Toney describes the actions leading to the hostile work environment claim as follows: "he was cussed at, followed and observed using the lavatory, verbally abused, and had racial slurs used against him." ECF 42-1 at 7. Only one of the actions Toney describes as harassment can be described as race-based: the alleged use of the odious racial slur, "nigger." However, Toney has not identified which individuals used this derogatory term, nor has he alleged that any of his supervisors were involved in this isolated incident. *See Boyer-Liberto*, 786 F.3d at 280 (explaining that two uses of the epithet "porch monkey," by a supervisor, is sufficient to create a hostile work environment); *see also Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger' *by a supervisor* in the presence of his subordinates.") (quoting *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (emphasis added)). Further, Toney adduced no evidence that he told Powercon management, or anyone else, about his co-worker's alleged use of that pejorative. He did not mention that alleged incident in his first EEOC charge on February 1, 2017. ECF 1-5. And he did not mention the incident in his six-page letter to Wolfe and Siegel on January 17, 2017. ECF 1-2. To impute the unnamed co-worker's harassment to Powercon, Toney must show that Powercon "knew or should have known of the harassment and failed 'to take prompt remedial action reasonably calculated to end" it. *Freeman*, 750 F.3d at 422-23 (quoting *Amirmokri,* 60 F.3d at 1131) (internal quotations omitted). He has made no such showing that Powercon knew or could have known of the conduct during Toney's employment. Certainly,

Powercon was not given an opportunity to "correct promptly any harassing behavior." *Spriggs*, 242 F.3d at 186.

The alleged incident in which a manager in another facility, "Myron," followed Toney into the bathroom and peered through the crack in the stall because he believed Toney had been in the lavatory too long, has no evident connection to Toney's race. Moreover, Toney acknowledges that he does not know whether Myron was disciplined for the incident by Powercon, and the conduct was not repeated. ECF 42-5 at 65:13-18.

To the extent Toney alleges specific incidents in which he was on the receiving end of yelling and cursing, "Title VII does not create a general civility code in the workplace." *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 335 (4th Cir. 2010) (internal quotation marks omitted). "[C]omplaints premised on nothing more than rude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under Title VII." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (internal citations omitted). In this case, Toney's own testimony about Mooney's response to his complaints indicates that the cursing and yelling described is part of the culture of Powercon's workplace, and was not directed particularly towards Toney because of his race. *See* ECF 42-5 at 55:13-16 ("Mooney said, 'Don't worry about it. That's how they act. I thought you was going to hit him. He acts like that to everybody."); 56:1-6 ("I cuss him out sometimes."). Indeed, in his opposition, Toney does not contend that the general vulgar language was race-based. *See* ECF 42-1 at 7.

Toney's other general allegations lack sufficient specificity to be considered in the context of a summary judgment motion. *See Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 142 (4th Cir. 2007) (deeming "several general statements of dissimilar treatment" to be insufficient to

defeat summary judgment); *Causey v. Balog*, 162 F.3d 795, 802 (4th Cir. 1998) ("[C]onclusory statements, without specific evidentiary support, cannot support an actionable claim for harassment."); *see also Dangerfield v. Johns Hopkins Bayview Med. Ctr., Inc.*, Civil No. JKB -19-155, 2019 WL 6130947, at *3 (D. Md. Nov. 19, 2019) (stating, with respect to general allegations of consistent "condescending and abusive language and behavior," "[w]ithout details about the nature of the remarks and behavior at issue, it is impossible for the Court to determine whether the behavior she complains of would be seen as objectively hostile by a 'reasonable person'"); *Lenoir v. Roll Coater, Inc.*, 841 F. Supp. 1457, 1462 (N.D. Ind. 1992) (finding plaintiff's allegations of being reprimanded more severely than co-workers, without reference to exact dates, to be insufficient to support a harassment claim), *aff'd*, 13 F.3d 1130 (7th Cir. 1994). Thus, in the absence of any specific evidence of race-based hostility in the workplace, of which Powercon was aware, summary judgment must be granted in Powercon's favor as to Count Two.

### C.     Plaintiff's Claim of Retaliatory Termination

Toney alleges that on February 8, 2017, Powercon subjected him to the quintessential adverse employment action – discharge – following his February 1, 2017 EEOC charge, which asserted race discrimination. Toney offers no direct or circumstantial evidence to prove his claim of retaliation, such as statements made by Powercon employees expressing retaliatory animus. *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). Accordingly, this Court will consider his retaliation claim under the *McDonnell Douglas* framework.[3] *See id.* Under that framework, if a plaintiff establishes a *prima facie* case of retaliation, the defendant must present

---

[3] Toney's opposition does not specify the legal framework under which he seeks to proceed. ECF 42-1 at 8-11.

evidence of a legitimate non-discriminatory reason for its challenged action, which shifts the burden back to the plaintiff to prove pretext. *Foster,* 787 F.3d at 250.

The *prima facie* case required to establish unlawful retaliation under Title VII includes evidence (1) that the plaintiff engaged in protected activity; (2) that he suffered an adverse employment action and (3) that there was a causal connection between the two events. *Boyer-Liberto*, 786 F.3d at 281. Here, Powercon appropriately does not contest Toney's ability to show that he engaged in protected activity when filed his first EEOC charge on February 1, 2017, or that he suffered an adverse employment action when he was terminated on February 8, 2017. *See* ECF 38-1 at 33 (accepting the first two elements *arguendo*, and focusing its argument on the causation element). The parties' dispute centers around Plaintiff's ability to establish the required causal connection between the two events. *See id.*

The evidence presented here, viewed in the light most favorable to Toney, establishes a *prima facie* case of causation. Toney cites to the very close temporal proximity between his February 1, 2017 discrimination complaint, which Powercon learned about prior to his termination, and his February 8, 2017 firing. ECF 42-1 at 10; *see also* ECF 42-11 at 37:11-21 (Siegel testimony acknowledging receipt of first EEOC charge before Toney's termination). This proximity, with the events occurring in a one-week span, meets the low bar for a *prima facie* case. *See, e.g.*, *King v. Rumsfeld,* 328 F.3d 145, 151 n.5 (4th Cir. 2003) (finding that a ten-week gap between the protected activity and the adverse action established the causation element of the *prima facie* case); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989) (holding that an employer's knowledge of an employee's discrimination claim, coupled with the employer's subsequent firing of the employee, satisfied the *prima facie* causation showing).

However, as described above, Powercon meets its burden to produce evidence of a legitimate, non-discriminatory reason for the termination – namely, Toney's poor job performance, including his continued insubordination and refusal to complete tasks assigned by Mooney, despite the implementation of progressive discipline. *See Evans v. Tech. Applications & Servs. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) (affirming poor job performance as a legitimate, non-discriminatory reason).

The burden then shifts to Toney to prove pretext. For Title VII claims of unlawful retaliation, "[t]he causation standards for establishing a prima facie retaliation case and proving pretext are not identical. Rather, the burden for establishing causation at the prima facie stage is 'less onerous.'" *Foster*, 787 F.3d at 251. To prove pretext, a plaintiff must show "both that the [employer's] reason was false and that [retaliation] was the real reason for the challenged conduct." *Id.* at 252. In other words, at the pretext stage, the plaintiff must show "that retaliation was a but-for cause of [the] challenged adverse action." *Id.*

In this case, Toney points to two facts, other than the temporal proximity used to establish the prima facie case, that could advance his claim of pretext: (1) factual disputes about the alleged insubordination leading to his pre-charge discipline in late January; and (2) the EEOC's finding that retaliation had occurred. ECF 42-1 at 8-11.

With respect to his pre-charge discipline, Toney contends that he could not follow Mooney's directions to use particular equipment to move certain materials, as a result of his lack of experience with some of the tools and because Mooney's expectations regarding the capabilities of the pallet jack were unreasonable. ECF 42-1 at 9-10 ("With respect to the warnings, Mr. Toney explained to Mr. Mooney that he was not comfortable using the pallet jack."). This Court does not second-guess the job performance evaluations of an employer, and is particularly ill-equipped

to opine on the appropriate use of industrial moving equipment. *See Huang v. Gutierrez,* Civ. No. AW-08-2882, 2010 WL 5301035, at *7 (D. Md. Dec. 20, 2010) ("[T]he Court declines Plaintiff's invitation to substitute its own job-performance judgments for those of Plaintiff's supervisors."); *see also Addison v. CMH Homes, Inc.,* 47 F. Supp. 3d 404, 420 (D.S.C. 2014) ("As long as the requirements imposed are bona fide expectations, it is not the court's province to determine whether an employer demands too much of its workers."). However, even assuming that Toney is correct about his own lack of experience with a pallet jack, and the inability of that equipment to be used over gravel, Toney does not introduce evidence contradicting Powercon's evidence that he refused to follow his supervisor's instructions. Regardless of whether Mooney's instructions were sensible, Toney has not established that the request was anything but a genuine attempt to accomplish work-related tasks. Thus, despite Toney's contention that he only resisted unreasonable requests from Mooney, he cannot establish that Powercon's proffered reason for his termination, insubordination, was pretextual.

Second, Toney again cites the EEOC's Determination as a basis for a finding of pretext. ECF 42-1 at 10-11. As noted above, conclusory findings by the EEOC "are not sufficiently probative to create a genuine issue of material fact." *Goldberg v. B. Green and Co., Inc.,* 836 F.2d 845, 848 (4th Cir. 1988); *see also Allen v. Dorchester Cty., Md.,* 2013 WL 5442415, at *4 n.7 (D. Md. Sep. 30, 2013) ("This Court reviews claims of discrimination under Title VII de novo, and thus is not required to accord weight to the EEOC's determination.") (quoting *Laber v. Harvey,* 438 F.3d 404, 420 (4th Cir. 2006)). The EEOC's Determination with respect to Toney's second charge again provides no explanation for its conclusions, asserting only that "[a]n analysis of the information obtained during the Commission's investigation supported Charging Party's allegation that he was retaliation [sic] against and discharged because he participated in a protected

activity" and "[t]he record shows a causal connection between Respondent [sic] action of retaliation against Charging Party and his discharge upon Respondent's receipt of EEOC notification of [sic] discrimination charge." ECF 42-8 at 1-2. The determination does not describe the "information obtained during the Commission's investigation" or the alleged "causal connection," leaving this Court utterly unable to evaluate the factual basis for the EEOC's finding. Accordingly, like the EEOC findings considered in *Goldberg,* the EEOC determination here has little probative value, and does not itself support a finding of pretext by this Court.

Thus, absent any competent evidence that Powercon's non-discriminatory justification for Toney's termination was pretextual, summary judgment on Count Three is also appropriate.

### CONCLUSION

For the reasons set forth above, Powercon's Motion for Summary Judgment, ECF 38, will be GRANTED. A separate Order follows.


Dated: February 14, 2020 _____/s/_____
Stephanie A. Gallagher
United States District Judge